Perez v. Porte, case number 25246. Good afternoon. Good afternoon. May it please the court, Rory Pelantoni for the plaintiff appellants. I know you're aware of Cruz. You asked us to submit supplemental briefings, so I don't know if you want to have any questions about Cruz first or where we should focus on the argument today, given that we are waiting for the Cruz decision, or maybe not. I don't know if we are or we're not. We're aware of Cruz. We're aware, I think, that argument is set for January 6th of next year.  And hopefully that will, and I think it appears that both parties seem to agree that however the New York Court of Appeals resolves the question before it in Cruz will almost necessarily resolve the Cruz-related question before us. Is that correct? I'm looking to both of you, but yes.  So if I may, I'm sure there's a lot in our briefs about Cruz, and you've read all of it. I'd just like to go to the statute briefly, because we talk about whether or not the class size is a separate, this is a list of class sizes where the DOE gets to pick one, or whether the class sizes are a continuum where all of them have to be satisfied. And I would just note that the 200.6, subdivision 4, talks about the maximum class size for students whose special education needs consist primarily of the need for specialized instruction, and it goes on to say shall not exceed 15 or 12 in a state-operated school. But then it says except that. And that's where we get to one maximum class size for special classes containing students whose management needs interfere. It goes on to say shall not exceed 12. Two, maximum class size for special classes containing students whose management needs are determined to be highly intensive, shall not exceed 6. B, shall not exceed 8. And then 3 is shall not exceed 12. It seems to me that given the class sizes are the exception to the original class size, this isn't a list where the New York State Department of Education told not just New York City, because this is a statute for the entire state, that you get to pick one of these class sizes. And again, I know we've briefed this issue, but the idea that a student has multiple disabilities and should be in a class that does not exceed 6, 12 I mean, does not exceed 12, highly intensive management needs shall not exceed 6. We seem to look at the multiple disability statute as mandating 12. A 6 to 1 to 2 class satisfies both sections of the statute. The class size does not exceed 6 for my... But there was also evidence in the record that paradoxically your client would be better served by a 1 to 12 ratio because that would afford more specific one-on-one attention than a 1 to 6 because you had more professionals in the 1 to 12. Well, that brings us to whether or not the student should have a 1 to 1 para like most students do. And if the student were in a 6 to 1 to 2 class, the ratio would be the same. But I'd also just remind the court that... So you're saying that your client would be satisfied with... Correct me if I'm wrong, that if there's a 1 to 12 ratio, then there should be an extra paraprofessional in the class for your client. Well, the student apparent did ask for a 1 to 1 para, and that is something students with these injuries have. This student didn't have it in this one school year. But yes, normally they have a 1 to 1 para, and that's one of the things we ask for here given the student is non-ambulatory, non-verbal, has medical needs, needs to be lifted when transferred out of the wheelchair. Giving a student 3 or 4 adults in a class where nobody's watching this student all day can be problematic. And when your Honor says my client would be better served, when you have 12 students in a class, let's use 6-hour school day because I'm not good with math. I can't do an 8-hour school day. But 12 students at 6 hours, each one would get 30 minutes of 1 to 1 instruction. When you reduce that class size to 6 with 6 hours in a school day, each student can spend an hour with the special education teacher. And that's what this is about, not about support necessarily, but special education. But isn't that precisely the kind of determination that we are obligated to give deference to the DOE decision makers? I would say not in the first instance here. Your job, I'm not asking you to decide which is better because we have a statute that creates the floor. Once we decide or the New York State Court of Appeals decides shall not exceed 6 means 6. Then the DOE can start from there and use its expertise to develop a program. Nobody's saying they can't use their expertise. But where the New York State Department of Education utilized their expertise, right? This is not me making up a statute. They decided there would be this continuum of classes as a starting point. And let me just, I see my time is up. I just want to mention the fact that the DOE, I know there are a lot of things we didn't plead in our due process complaint and we've discussed forfeiture and we'll leave that in a brief. But the one issue here that I think is worthy of attention is the DOE only considered the 12 to 1 to 4 class. When the parent had a preference, we cite EH and I know you're not bound by the case, but it is law in the district courts that where the DOE fails to consider, doesn't have to place the student in mom's 6 to 1 to 1 or 8 to 1 to 1 class, but they have to consider it and explain why they ruled it out. They didn't do that here. The only program under other options considered for the 2019-20 IEP is special class size and specialized school 12 to 1 parentheses 3 to 1. May I ask you something that's unrelated to the class size issue? Of course. So this, the child CP needs to use a switch, as I understand it. It's called a Big Mac switch. What is that? Just tell me what that is, first of all. My understanding of the Big Mac, a lot of these students have problems with sight, not because they have a problem with physically. They have CVI, which- What's CVI? Cortical visual impairment, I think. But the brain in students with traumatic brain injury can't process the images. So I'm looking at you with nothing wrong with my eyes. It's not like glaucoma or something else, but they can't process. So they need these devices that help them track, you know, use an iPad, focus. I know we wanted a device for the student. I believe the Big Mac was an assistive device. Does he have that device? It seems like he's got access to the device. Is that right, or am I misreading the record? I mean, back then he just started to have access to the device. We're talking about 2019. So I know as- But back then- It wasn't relevant in time, yeah. He would have had access, but it wouldn't be like the access or the dedicated devices they have today. So now I'm a little confused. So there's another device, a better device today that he's got access to. Today they use an iPad and it has the technology is, yes, much better today than it was then. I think it was a more primitive form of an iPad. Well, maybe your friend can help me with that, but I'm not sure that I understood what this switch does and what the access or lack of access does for CP. Okay. Well, you've preserved some time for rebuttal. Thank you. And we'll hear from your friend on the other side, Mr. Pappalo. Yes, Your Honor. Good afternoon, Your Honors. May it please the Court, Jonathan Pappalo for appellees. As Your Honor noted at the outset, both parties are in agreement that the decision in this case should be held in abeyance pending, I guess, the New York Court of Appeals resolution of the certified question and then also this Court's resolution. I think the way that the supplemental briefing was phrased is that it would be held in abeyance pending the decision in this Court's decision. Oh, this Court, the panel that certified the question, yes. Correct, yeah. And it seemed at times, though, that part of what Mr. Bellatoni was arguing was the merits of the certified question, and I don't, I mean, you can disagree with that, but I don't feel like I, unless you want me to, to kind of get into that. Maybe you can help me with this switch, which I've never heard of before. So one of the IEP's goals is for CP to continue learning how to use a Big Mac switch, right? Correct. But the IEP doesn't formally require CP to have regular access to a Big Mac switch. Is that also correct? That's correct. So why doesn't that make the IEP somewhat internally inconsistent? Because I think what the testimony from some of the members of the Committee on Special Education who formulated the IEP was that they didn't feel that a, you know, a formula, a formal recommendation was necessary in the IEP, because in some ways that can then tie the teacher's hands as to what they use. But certainly if you look at the IEP in the testimony at the hearing, they certainly contemplated so. So if the IEP says you've got to use a Big Mac switch, I'm still trying to understand. I think the idea would be then you'd have to use one to the exclusion of others. It could potentially take some of the – that's what I seem to be seeing. So Mr. Bellantoni's answer was actually quite, in retrospect, quite helpful, because the technology develops relatively rapidly, and now there's a new technology. I think that was – I mean, they certainly talked about goals of using it more, and I think there was a reference in one of the progress reports that the child had been able to occasionally use the switch without hand-over-hand assistance, and they were hoping that he would be able to grow with that and do more of that and utilize the Big Mac switch increasingly. I did want to note something from the SRO's decision, though, that – this is something I'm quoting now. Evidence in the hearing record shows that the student who was nonverbal communicated through a variety of means, and it goes through the list of five of the means in which the student communicated, of which the Big Mac stick was just one of five. The others were vocalizations, eye gaze, facial expressions, pushing away or pulling an item towards or away in front of himself. And what the SRO determined from that is that it agreed with the CSE that it did not show that it required a specific device as a formal recommendation in the IEP to access its educational program and receive a free and appropriate public education. So that's the response on assistive technology. I think there was a little bit of discussion about the procedural objections, and I think as a threshold point, the case law is pretty clear that if you don't assert them in a due process complaint, they're forfeited. And there's really no reason to depart from that in this particular instance. The statute doesn't draw a distinction. And there's nothing other than it was an extremely generic, broad allegation in the due process complaint about that DOE deprived the parent of an ability to participate in the decision-making process that I think both the magistrate judge and the district court, or certainly the district court, properly held was not specific enough to constitute clear notice. And just to speak to the last point here on the consideration of the 12, 4 plus 1 classroom as opposed to the 6, 1 plus 1 that they refer to as a procedural violation, at the end of the day it's subsumed within the substantive question because the procedural, you know, a 6, 1 plus 1 class was the most appropriate. I'm sorry, determined that the 12, 1 plus 4 class was most appropriate partly based on its assessment that the student had a plan that primarily involved habilitation and treatment, which is actually in the statutory definition for a 12, 1 plus 4 class. So they made that determination, and the fact that they may not have considered the class that the parent now believes that the student should have been placed in, it can't, it's subsumed within the substantive question of whether the classroom placement was correct or not because a procedural violation to deprive someone, it has to rise to the level of depriving you of fate. So it's subsumed within the substantive question. So let's just say hypothetically that your position loses in front of the New York Court of Appeals. Is there any way for you to prevail on this issue here? It would depend on how it's written. But, I mean, if the Court of Appeals says absolutely, you know, if you have somebody who has highly intensive management needs and multiple severe disabilities, if you have both, they must, no discretion whatsoever, they must be in a 6, 1 class, then, yeah, I would assume that we would not prevail. What if they say something a little less, a little bit more nuanced than that? I think then this Court would have to apply it to the facts of this case. I mean, I could see it. Then what are the factors that we would consider? Well, I think the factors, it's hard to say because it would depend on what the Court of Appeals says. But I think generally the Court was very clear in Cruz that the question was solely, you know, if assuming that the CSE and the DOE have discretion, this is the quintessential question where you defer to the expertise of the CSE and also the SRO. Right. So any nuance, meaning any discretion in yours to the benefit of the DOE? Correct. I mean, I think as long as the option is still open to them, we would take the position that it was appropriate and didn't deny a FAPE and you should defer to the SRO's determination that it didn't deny a FAPE. Am I right that this was, did the SRO, well, did DOE view itself as having discretion? Yes. It did, okay. I mean, that was, I think the question was briefed and was decided in a case prior to Cruz in Carrillo and then in Cruz the Court decided that it was unclear and that it wasn't. Can I follow up on Judge Laurier's question just now? Sure. Was the six, one plus one placement considered under the relevant New York regulations? I'm not sure I can, I'm not sure what the, what Your Honor means by under the relevant regulations. Well, whatever regulations may be relevant. Well, I mean, it is, it was an option that could have been available. The CSE determined that the particular placement that was most appropriate for this student, based on prior history, based on their evaluation of the progress reports, based on the fact that this program primarily involved habilitation and treatment, was a 12, one plus four. I understand that. But in the course of doing that, if we accept the proposition that CP required highly intensive management, why wasn't six, one plus one placement at least considered under the relevant New York regulations? I think it was sort of considered in the sense that they looked at what they felt was most appropriate for the student. They were aware of the management needs but felt that those could be appropriately handled by the faculty, and perhaps even better handled by the fact that there were four paraprofessionals in a classroom. Is that on the record? Obviously, part of the reason we're asking these questions is if there's any nuance in the New York regulations, then it becomes our problem. Understood, yeah. I think it's actually, there's mention of it both in the SRO's decision, in the briefing, and as well, the SRO in the briefing, I believe, referenced some of the hearing testimony from, I believe it was the ADAPT school psychologist who talked about, you know, that this was some of the thinking as to why it wasn't necessary. Though, it used to be clear at the court that they did say that, and I think this is what Mr. Bellantoni seized upon, that they didn't consider a six, one plus one class, because they felt that the best suited class for. Well, that goes back to my question. So, if there's sufficient nuance in the ultimate decision of the New York Court of Appeals that allows for, or maybe even compels some consideration of either one of those arrangements, right, and on this record, there's no record that the six, one plus one placement was considered, would that not be problematic for you? Not particularly, because the SRO, we're not looking at this in an abstract. We're still evaluating the sufficiency of the SRO's determination, right? I mean, the SRO looked at that fact and came to the conclusion that it didn't deny. So that's the answer. Correct, yes. Just a structural question I think that I'd like you to help me with. Under the way the IDEA works, parents go to the New York City system to get IEPs and to get reimbursements and so forth. Is this money ultimately refunded by the federal government to New York, or is this all local taxpayer money? I can't say with absolute certainty, Your Honor, but I believe it's all local taxpayer money. It's what? I believe it's local taxpayer money, but I really don't. The answer I should say is that I don't know. It's my understanding it's taxpayer money, but I don't know. Thank you. Mr. Donatello. Your Honor, the one thing I am sure of is it's not all taxpayer money. I don't know how much. I don't think it covers the entire amount. But part of what happens is the state of New York takes the federal funds, passes them down to the local school districts, and in order to get the money, this is where the municipalities agree to give parents procedural rights, the state put provision, they agreed to not have the sovereign immunity protection they would normally have, but they do take federal money. I don't know how much. It's earmarks for students. I can't imagine it's the whole program, but there are federal funds. So if a student prevailed in one of these proceedings, do you have any idea of how much of, say, the transportation costs and the other costs are picked up by the federal government as opposed to New York City? I don't because the federal funds go to the state, go to the city. They're not paid in pieces. And I can't imagine that the students are getting 100 percent of what these costs are. But I don't know the extent of the federal funds and if they get them for other students who don't have as severe problems as these students. I've never actually been able to figure out exactly how much is allotted for each student, but it does come from the federal government. Your Honor, the SRO decision on page 19 talks about the computer students' ability to activate a computer adaptive switch or other communication device, including a Big Mac switch, and included a short-term objective to expand students' use of AAC devices to participate in language activities. The SRO decision then says the ADAPT school psychologist testified that a significant improvement, the ADAPT team noted there was a significant improvement in the student's ability to independently activate the switch. Obviously, if it's part of the IEP, then there's no doubt this and other devices have to be provided. You heard Mr. Pablo. Maybe ironically, ambiguity here that is not specifying the switch as a need is helpful. And it's consistent with what you're saying, which is the relatively rapid development of technology in this area, where if you have it in the IEP, you're frozen with this switch. If you don't have it in the IEP, and maybe this relies at some level on good faith, I don't know, but if you don't have it in the IEP, it provides some flexibility to advance technologically and provide greater aid, not less aid. So the school psychologist also testified that the student did not need a programmatic IEP-driven communication device to address his communication needs, and as such, the CSE did not recommend the student receive a formal assistive technology device. She further stated the CSE did not consider any other devices for the student, as it had concerns regarding ability to fully understand how to use the device and the appropriateness. And again, to answer, there was another question. As far as I see in the IEP, there was no consideration of the 6-1-1 program. The only program they considered here was the 12-1-4, and that was it, at least in the IEP and what they recorded that they considered for this student. Thank you. Thank you. Thank you. We're going to reserve a decision.